BARNETTE, Judge.
This is a suit arising out of the alleged breach of a contract for the sale and purchase of certain real property. The proposed vendees, Fellman J. Pierre and Delores G. Pierre (husband and wife), hereinafter referred to as Pierre, brought suit against the proposed vendor, Walter R. Chevalier, Jr. (Chevalier), for specific performance, but by amendment converted their demand into one for return of the deposit and recovery of a like amount ($1,-800) as penalty and for attorney’s fees. They were joined as party plaintiff by Z. T. Ramsey, Jr., doing business as Z. T. Ramsey., Jr. Realty Company (Ramsey), seeking recovery of $540 representing the realtor’s commission.
The defendant, Chevalier, answered denying his alleged breach of the agreement and countered with an allegation of breach by Pierre and Ramsey. He assumed the position of plaintiff in reconvention and prayed for forfeiture of the deposit of. $1,800 and attorney’s fees.
The reason for the failure of the sale to be consummated was an alleged cloud on the title of the property in question. Whether or not the alleged defect in title was timely brought to the seller’s knowledge and an opportunity given to him to do necessary curative work or whether or not he was arbitrary by refusing to take steps to remove the cloud from the title are matters of dispute which will be discussed below.
*63 The trial court rendered judgment in favor of the defendant and against the plaintiffs on the main demand and dismissed their suit at their cost. On the re-conventional demand there was judgment in favor of Pierre and Ramsey, defendants in reconvention, and against Chevalier, plaintiff in reconvention, dismissing the reconventional demand at Chevalier’s cost.
From that judgment Pierre and Ramsey appealed. Chevalier, plaintiff in reconvention, did not appeal nor has he answered the appeal in this court. Therefore, the judgment dismissing his reconventional demand is now final and is not before us on this appeal. The only issue before us is the correctness of the judgment of. the trial court dismissing the suit of plaintiffs, Pierre and Ramsey, on the main demand, and our opinion will be limited accordingly.
On April 14, 1965, a purchase and sell agreement was entered into between Mr. and Mrs. Pierre as purchasers and Walter R. Chevalier, Jr., by which the Pierres offered to purchase the property, referred to as 1426-28 Egania Street in the City of New Orleans, for $18,000. The offer was made on an “Agreement to Purchase or Sell” printed form in common usage by the real estate brokers in the New Orleans area. It was timely accepted by Chevalier, referred to as “owner.” The sale was conditioned upon the ability of Pierre to obtain financing of $13,200. A deposit of $1,800 was made by Pierre, being 10 percent of the purchase price. The act of sale was to be completed on or before June 14, 1965. The contract fixed the agent’s commission at 3 percent and contained the following specific conditions which are relevant to the issues in this case:
“The seller shall deliver to purchaser a merchantable title.
“In the event the purchaser fails to comply with this agreement within the time specified, the seller shall have the right to declare the deposit, ipso facto, forfeited, without formality beyond tender of title to purchaser; or the seller may demand specific performance.
“In the event the seller does not comply with this agreement within the time specified, the purchaser shall have the right either to demand the return of his deposit in full plus an equal amount to be paid as penalty by the seller; or the purchaser may demand specific performance, at his option.”
Pierre made application for financing through Greater New Orleans Homestead Association which agreed to make the mortgage loan of $13,200 subject to the usual conditions, including title approval. The title examination was made by Mayer L. Dresner, an attorney at law and recognized expert in title examinations, who found a conflicting chain of title emanating from a City of New Orleans tax sale in 1924 for 1923 taxes. Through succeeding acts of sale the tax title came unto John W. Cavanah, Jr., and Wiley Brooks Cavanah, who at the time of. the title examination were the owners of record under that chain of title.
Mr. Dresner testified that he made inquiry of the title attorneys who represented Dixie Homestead Association and Eureka Homestead Society, both of which homestead companies had made mortgage loans on the property, but neither of them had any information upon which to resolve the apparent conflict in title. He then informed “the agent” (we assume Ramsey) of the situation and billed Pierre for $175.25 for cost incurred in title work. The loan application approval was, of course, withdrawn by Greater New Orleans Homestead Association.
There is a dispute whether Chevalier was informed of the reason for title disapproval or given an opportunity to correct a specific defect. Chevalier contends that he was merely informed by Ramsey that there was a cloud on the title. He then contacted the attorney and title expert who had previously approved the title for Dixie *64 Homestead in connection with his loan application. He said: “I requested him to correct whatever was necessary to be since he was the attorney.” Chevalier’s attitude was one of disbelief, since two reputable homestead associations had approved the title and he insisted that his title was merchantable. There is no evidence that he took any further steps to learn what the alleged defect in title was.
Ramsey testified that when the title defect was reported to him he contacted Pierre and Chevalier. He admitted that there was nothing in writing and that his communication was by telephone. He was asked:
“All of the involved technical information similar to what was given by Mr. Danziger [sic] [Dresner] on the witness stand was communicated to Mr. Chevalier?”
He replied:
“I told him that the homestead and the lawyer I think it was for the previous homestead claim that there was a defect in the title and the titles weren’t merchantable and I ran back and forth to explain to him just what it is and the aspect of the defect, I don’t know just what it is.”
He further testified:
(By Mr. Adkins)
“Q Do you know of your own knowledge whether Mr. Chevalier was ever notified in detail of the alleged defects ?
A In detail?
Q Yes.
A I don’t know except I informed him.
Q You told him that there was ‘a defect’ ?
A Yes.

BY THE COURT:
Q In other words, you told him that the title couldn’t be passed until some defect which the lawyers found had to be straightened out?
A Yes.
Q Whether or not he did anything to straighten them out, do you know?
A I think — we talked, I thought he had contacted the lawyer for the homestead.
Q You thought he had contacted the lawyer ?
A Oh, yes.
Q But you asked him to extend the time for the passage of the Act of Sale?
A And he got to the point where he couldn’t, he wouldn’t communicate.
Q In other words, he did not then in writing extend the time for passage of the Act of Sale ?
A No.”
This extension of time to which the judge alluded in the foregoing question had previously been mentioned by Ramsey in the following testimony:
(By Mr. Elie)
“Q Did you at a point ask Mr. Chevalier to extend the time under the contract so that curative work to [sic] be done?
A I did.
Q Did Mr. Chevalier agree to extend the time under the contract for curative work done?
A No, he suggested to sell them something else.
Q Is it your testimony that he refused to extend the time under the contract so that curative work could be done, is that your testimony ?
A That’s right.”
*65 At a later point he testified:
(By Mr. Adkins)
“Q Can you give a reason for your statement that you just made to Mr. Kanuk, Mr. Ramsey ? You stated that Mr. Chevalier would not do anything.
A Because I had talked to him, I been to him, I tried to get him to extend the contract to get the title straight.”
The negotiations for the purchase of the property actually began with a contract on March 22, 1965. Pierre testified there was some difficulty in obtaining the loan conditioned in that contract, and a new contract (which is the one sued on) was signed April 14. A 60-day delay for obtaining the loan of $13,200 was provided in that contract.
Mr. Chevalier testified:
(By Mr. Adkins)
“Q When were you informed by whom that there was an apparent cloud on your title ?
A After the first contract which was signed around March, we signed the contract I think for sixty days and just shortly before the contract was expired Mr. Ramsey called me and said there was a cloud in the title, that they needed some more time. Well, I told him I would be more than glad to come over to sign another agreement. That’s when we went into the second contract for sixty more days and after that I never knew anything no more about it until further back around October when I got a letter from Mr. Dres-ner telling me about the fees of examining the titles. * * * ”
He said he did not know that failure of financing was the cause of the extension and the renewal of the contract, saying:
“ * * * [I]t was about the title from the beginning and Mr. Ramsey said he’s sure within the next thirty days it would be all cleared up, so he wanted another sixty days, I mean, thirty and thirty which was sixty so I gave it to him and after that when he called me up and said about he needed some more time I done gave you one extension on this contract, I said there’s nothing wrong with the title. * ■ * * ”
He then suggested that the loan be made with Dixie Homestead who had already approved title. He also suggested that Pierre take another house which he had for sale “around the corner” but all the while contending that his title was good and merchantable.
June 14 passed without anything being done by either party to complete the sale and Chevalier said he heard nothing further until October, when he was billed for Mr. Dresner’s title examination.
Chevalier seeks to justify his failure to attempt correction of the defect in his title on the contention that he was never informed of the nature of the alleged defect and therefore had no knowledge of the curative work required. Because of his strong contention on this point, we have fully summarized all pertinent testimony though it might unnecessarily add to the length of this opinion. There was nothing in writing informing Chevalier of the specific defect with specific requirements for curative work. However, we must conclude from the testimony that Chevalier made no request for specific information and requirements for curative work, although the existence of a cloud on his title was brought to his knowledge timely and he refused a request for extension of time to do curative work. He should at - this point at least have made an inquiry of the nature of the defect and the requirements for correction. Instead, however, he assumed the attitude that his title was not defective.
Chevalier denied that his attitude was arbitrary and asserted his good faith in reliance on the title approval of Dixie and Eureka. Under the decision of the *66 Supreme Court in Ducuy v. Falgoust, 228 La. 533, 83 So.2d 118 (1955), this would not relieve him of the application of the penalty provision of the contract.
In that case a similar factual situation was presented and the plaintiffs-appellants, Mr. and Mrs. Pierre, rely strongly on the authority of that case in support of their demand for return of deposit plus a like amount as penalty. In that case there was, as here, an adverse tax title chain. The owner-seller had made efforts without success to secure a redemption certificate. The adverse tax title claimant refused to execute a redemption and the State Tax Collector for the City of New Orleans also refused to grant redemption for the reason that the title was in the name of a tax purchaser and not the State Tax Collector. The only difference is that in this case the owner-seller (Chevalier) made no attempt to secure a redemption, nor did he make a serious effort to determine and remove the cloud on his title. The Court correctly held, as we do here, that the outstanding adverse tax title constituted a cloud on the title, suggestive of litigation, and the title was therefore not merchantable. The Court said:
“ * * * Consequently, inasmuch as the plaintiffs cannot specifically comply with the agreement they entered into, being without a valid and merchantable title to convey, the defendant is entitled to the return of the $780 deposited by him, plus an equal amount as stipulated damages.” 83 So.2d at 124.
Justices Hamiter and Hawthorne dissented in that case holding to the opinion that the seller should not be penalized for a condition not of his making, beyond his control, and not resulting from his fault, arbitrariness or refusal. This was the rationale of the Court’s opinion in Johnson v. Johnson, 213 La. 1092, 36 So.2d 396 (1948), but Chief Justice Fournet, writing for the majority in Ducuy v. Falgoust, supra, said:
“This conclusion necessarily disposes of the contentions of the plaintiffs and we will not, therefore, follow the holding in the case of Johnson v. Johnson, supra.
“It is interesting to note that the holding in the Johnson case was not followed by this court in two subsequent cases where identical contractual provisions were involved, i. e., Nelson v. Holden, 219 La. 37, 52 So.2d 240, and Samuelson v. Bosk, 219 La. 477, 53 So.2d 239. * * *” 83 So.2d at 124.
We construe this to be a rejection of the concept of arbitrariness, bad faith or fault as factors to be considered in the application of the penal clause in contracts of this kind. It simply holds that the seller contracted to convey a merchantable title by a fixed date; he did not do so and was therefore in default and subject to the contract penalty for default. Poche v. Ruiz, 239 La. 573, 119 So.2d 469 (1960); Caplan v. Airport Properties, Inc., 231 La. 1071, 93 So.2d 661 (1957); Williams v. Terese, 120 So.2d 80 (La.App. 4th Cir. 1960).
Some time after June 14, 1965, when it was apparent that the sale would not be completed, Ramsey returned the $1,800[1] deposit to Pierre without consulting Chevalier or obtaining his permission. His declared reason for doing so was that the contract “had expired” and that he acted on the advice of his attorney.
The defendant, Chevalier, contends that the unauthorized return of the deposit by Ramsey and its acceptance by Pierre constituted an active violation of the contract and that both Ramsey and Pierre have forfeited any right they might have had thereunder and are liable to him for dam *67 ages, citing LSA-C.C. art. 1932, which provides as follows:
“When there is an active violation of the contract, damages are due from the moment the act of contravention has been done, and the creditor is under no obligation to put the debtor in default, in order to entitle him to his action.”
He also relies upon the authority of Samuelson v. Bosk, 219 La. 477, S3 So.2d 239 (1951); Boisseau v. Vallon & Jordano, 174 La. 492, 141 So. 38 (1932); and Landry & Passman Realty, Inc. v. Keen, 170 So.2d 775 (La.App. 1st Cir. 1964).
These authorities are not applicable to the factual situation in this case. The alleged acts of contravention committed by Ramsey and Pierre were after the defendant, Chevalier, had himself breached the contract by failure to convey a merchantable title by the agreed date, June 14, 1965. Ducuy v. Falgoust, supra. This relieved Ramsey and Pierre of their obligations to Chevalier and by the terms of the contract Pierre was then entitled to the return of the deposit;
Chevalier further contends by way of defense to Pierre’s demands that there has been no putting in default. Since Chevalier assumed the attitude that the title was not defective and took no steps to determine and correct them and was in no position to offer a merchantable title, a demand by Pierre for performance would have been vain and useless. No formal putting in default was necessary under the circumstances. LSA-C.C. art. 1932; Poche v. Ruiz, supra; Caplan v. Airport Properties, Inc., supra; Fox v. Doll, 221 La. 427, 59 So.2d 443 (1952).
The contract contains the following clause:
“Either party hereto who fails to comply with the terms of this offer, if accepted, is obligated and agrees to pay the agent’s commission and all fees and costs incurred in enforcing collection and damages.”
Under the authority of this clause, the plaintiffs Mr. and Mrs. Pierre seek recovery of attorney’s fees in the amount of $750, but there is no evidence whatever in the record in support of this demand. In their brief filed in this court they further argue their entitlement to reimbursement of $172.25 as damages representing notary fees, costs and expenses incurred in connection with the title examination incident ■to their loan application. We have carefully examined their original and supplemental and amending petitions and fail to find any allegation or prayer in anywise relating to this item, and therefore we will give no consideration to this claim of special damage.
The contract also provides:
“If this offer is accepted, seller agrees to pay the agent’s commission of 3'% which commission is earned by agent when this agreement is signed by both parties and when the mortgage loan, if any, has been secured.”
The plaintiff Ramsey seeks recovery of the commission ($540) from Chevalier on the authority of this clause and also that quoted above relative to the obligation of the defaulting party, plus “reasonable attorney’s fees to be fixed by * * * [the] court.” The agent’s commission was earned under the foregoing provision upon acceptance of the purchaser’s offer by the seller, Chevalier, and attorney’s fees are allowable for enforcing collection thereof, but there is no testimony in the record as to what would be a reasonable fee.
A similar situation existed in Ducuy v. Falgoust, supra, and the Court said:
“We now pass to the defendant’s claim for fees and costs, including attorney fees connected with this suit. Under the express provisions of the contract ‘either party * * * who fails to comply with the terms of this offer * * * is obligated to pay the Agent’s Commission and all fees and costs incurred in enforcing collection and damages.’ *68 [Verbatim the clause in this case.] Both parties, by their pleadings, have construed this provision to cover attorney fees incurred in the instant suit, as both seek such recovery here. [The same is true in this case.] However, inasmuch as this was a matter not passed on by the lower court in view of the court’s conclusion that the plaintiffs were entitled to specific performance, and there is no probative evidence in the • record on which a conclusion could be based as to the value of the services rendered by the attorney for the defendant, the case will have to be remanded for the fixing of this amount.” 83 So.2d at 125.
We have stated above that there is no testimony or other evidence in the record before us touching upon the value of the services rendered by the attorneys, but we do not feel compelled to remand on this point as was done in the Falgoust case. We will exercise our discretion under LSA-C.C.P. art. 2164 and render judgment for attorneys’ fees which we consider just, legal and proper upon the record on appeal. The Falgoust case was decided prior to the adoption of the Code of Civil Procedure, and while it does not specifically say so, the remand was probably under authority of Code of Practice Article 906. Article 2164 of the Code of Civil Procedure gives to the appellate court a broader range of discretion than was provided by the Code of Practice.
In no event could there be such a divergence of opinion among experts on the reasonableness of attorneys’ fees in this case as to justify the added expense and delay incident to a remand. The litigation should be concluded in the best interest of all parties. Furthermore, in the matter of attorneys’ fees, this court is fully competent to decide without the aid of expert testimony what is reasonable in this case.
There was no bad faith on the part of Chevalier in offering his property for sale on the representation of a merchantable title, in view of its recent approval for mortgage loan by two homestead companies. The strict application of the penal provisions of the contract under the circumstances is harsh and is a factor we have considered in fixing the attorneys’ fees. We therefore will include in the judgment in favor of Pierre the sum of $450 for attorney’s fee which is 25 percent of the $1,800 penalty recovered. The deposit having been returned without litigation has not been considered in fixing the fee. For the plaintiff Ramsey we will award $150 for attorney’s fee, which is slightly in excess of 25 percent of the commission recovered.
For the foregoing reasons the judgment in favor of the defendant and against the plaintiffs on the main demand, rejecting the plaintiffs’ demands and dismissing their suit, is reversed and it is ordered, adjudged and decreed that there be judgment in favor of the plaintiffs Fellman J. Pierre and Delores G. Pierre against defendant, Walter R. Chevalier, Jr., in the sum of $1,800 plus an additional sum of $450 as attorney’s fee, all with legal interest thereon from date of judicial demand with all costs of court.
It is further ordered, adjudged and decreed that the judgment on the main demand in favor of the defendant and against the plaintiff Z. T. Ramsey, Jr., doing business as Z. T. Ramsey, Jr. Realty Company, rejecting plaintiff’s demands and dismissing his suit is reversed and judgment is now rendered in favor of Z. T. Ramsey, Jr., doing business as Z. T. Ramsey, Jr. Realty Company, against Walter R. Chevalier, Jr., in the sum of $540 plus an additional sum of $150 as attorney’s fee, all with legal interest thereon from date of judicial demand with all costs of court.
Reversed and judgment rendered on main demand. Reconventional demand not considered.

. The deposit having already been returned to the Pierres we have only to consider here their right to the penalty, $1,800.